UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| LEANE SCHERER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED<br>    Plaintiff,<br><br>  v.<br><br>MGM RESORTS INTERNATIONAL<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. <u>22-cv-258 HSO-BWR</u><br>)<br>)<br>)<br>)<br>) |

### FIRST AMENDED COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, Leane Scherer, individually and on behalf of all others similarly situated, who respectfully files this First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), seeking judgment for damages against Defendant MGM Resorts International.

Casino operators enter into hundreds of thousands of transactions a day with consumers. When a casino starts taking money from its customers by refusing to pay them change, it racks up millions of dollars in unlawful profits. Defendant MGM Resorts International is liable to thousands of its casino players for short-changing them.

### PARTIES

1.

Plaintiff Leane Scherer is an individual of the full age of majority domiciled in New Orleans, Louisiana.

Defendant MGM Resorts International is a Delaware corporation operating the following casino properties in the United States: Aria; Bellagio; Delano Las Vegas; Excalibur; Luxor;

Mandalay Bay; MGM Grand Las Vegas; New York, New York; Nomad; Park MGM; Mirage; Vdara; Gold Strike MGM Grand Detroit; MGM National Harbor; MGM Springfield; and Borgata. In Mississippi, MGM Resorts International operates the Beau Rivage in Biloxi, MS.

## JURISDICTION AND VENUE

2.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332. Scherer is a citizen of Louisiana because she is domiciled in New Orleans, Louisiana. Defendant is a citizen of Delaware and Nevada because it is incorporated in Delaware and its principal place of business is located at 3600 Las Vegas Blvd. South Las Vegas, NV 89109. The amount in controversy exceeds $75,000, as Defendant has intentionally short-changed its players millions of dollars. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332(d). The amount in controversy is in excess of $5,000,000, and Scherer and Defendant are diverse.

Venue is proper in this Court under 28 U.S.C. § 1391(b) because all of the events or omissions giving rise to the claims in this complaint occurred in Biloxi, Mississippi within this District and Division.

MGM Resorts International may be served with process within this District through its registered agent: Corporation Service Company, 109 Executive Drive, Suite 3, Madison, MS 39110-8497.

## Class Definition

3.

The Class that Plaintiff seeks to represent consists of: "all visitors to a casino owned or operated by Defendant between September 19, 2012 and present who received a Gaming Voucher

=

reflecting that they were owed any amount of cents and who attempted to redeem the Gaming Voucher at a Kiosk and never received their coins."

## FACTS

4.

Defendant is a casino operator. The casino locations it owns or operates are hereafter referred to as the "Casinos." Every day, hundreds of thousands of people enter Defendant's Casinos and gamble. They give the Casino their hard-earned money for a chance to win more money. The concept has existed for hundreds of years and is understood across the globe. The key to this contract of luck is the consistent application of agreed-upon rules and both sides honoring their debts.

The Casinos set the rules, and the players agree to those rules when they change their money, spin the wheel, roll the dice, or ante up. The Casinos are ensured their winnings because the games are operated on a cash-on-the-barrel basis. The players are supposed to be ensured their winnings because the Casinos are highly regulated by governmental entities and/or trade groups and follow strict rules in order to preserve the public trust and their right to operate. The Casinos have broken those widely understood and apparent rules, have violated the public trust, and are liable to the class members.

5.

The Casinos have been unlawfully taking money from their players by manipulating the cash-out system employed by their electronic gaming systems (hereafter "Slot Machines").

6.

When a player decides to play a Slot Machine at a Casino, she pays for credits with the machine via either cash or credit card. For example, on a 25-cent machine, a 20-dollar bill will buy

=

80 credits. By pressing a button or pulling a lever, the player then chances one or more of those credits on the "spin" or chance that the machine generates a winning combination. If the Slot Machine generates a winning combination, the credit count increases, if not, the credit count decreases. The player repeats this process as much as she cares to gamble. Sometimes the player runs out of credit and has essentially lost her money.  Other times, for whatever reason, the player decides to cease playing while there are still "credits" on the Slot Machine. That is where the issue herein arises.

7.

A player's decision to cease play before she has lost all of her money is commonly referred to as making the decision to "cash out." Cashing out is the conversion of the Slot Machine credits back into U.S. currency.

8.

When a player wishes to cash out, on the overwhelming majority of the Casinos' machines, she presses a button or display marked "Cash Out." In early generations of slot machines, coins would be dispensed at that point. In today's Slot Machines, instead, the machine prints a Gaming Voucher that reflects and represents the amount the Casino owes the player.

9.

The Gaming Vouchers generated by Defendants are all very similar. They bear a scannable barcode, the name of the casino establishment, the amount owed in dollars and cents, and several markings used either to instruct the player or assist the Casino in tracking vouchers.

10.

The Gaming Vouchers also bear similar language on their reverse side. They reflect that the Gaming Voucher is a bearer instrument and that the Casino is not liable for lost or stolen tickets.

=

The Gaming Voucher further states that "This ticket has no value outside Casino for any monetary purpose and may not be used at the Casino for any goods or services other than wagering activities or redemption for value in accordance with its terms." The Gaming Voucher goes on to shift liability for issues with the voucher to the player. The Gaming Voucher goes on to state that "Tickets must be cashed in person at the Casino."

11.

Since the adoption of electronic Slot Machines, Gaming Vouchers have been used as a convenience for the Casinos; Casinos do not have to stock each machine with cash and can instead stock a few automatic cash-out machines ("Kiosks"). For decades, players would insert a Gaming Voucher into the Kiosk at the Casinos and most other casinos, and the Kiosk would pay them in exact change, in coins, or cash.

12.

During the COVID-19 pandemic, the Casinos allegedly grappled with a coin shortage. Many similarly situated businesses posted signs informing customers that they were unable to pay exact change due to the shortage. In fact, many of the Defendant Casinos' competitors adopted responsible practices to notify players of the inability to pay change. For example, the Kiosk at the Wynn in Las Vegas bears a sticker that says "Machine only dispenses cash, ticket will print for change. Please take ticket to the cashier to redeem." Defendant's Casinos herein provide far less direction and disclosure.

13.

For the last few years, Defendant has essentially been "keeping the change" of hundreds of thousands of Gaming Vouchers, essentially robbing their customers a few cents at a time, on millions of transactions.

=

14.

The Casinos have created an intentionally complex, time consuming and cumbersome two-step process for a player to receive the change they are owed when they "cash out," yet failed to inform the players of the process. As explained fully below, the First Step being a Kiosk to receive paper currency, and the Second Step being the cashier or "cage," which is inevitably located an inconvenient distance from the First Step Kiosk. Not only is the Second Step inconvenient, time consuming, and cumbersome – the Casinos do not in any way advise their patrons where or how to receive any change they are due.

15.

When a player inserts a Gaming Voucher into a Kiosk at one of Defendant's Casinos, the Kiosk rounds **down** to the nearest dollar, and pays that amount in cash. At that point, depending on the Casino, the player either "donates" the change from the Gaming Voucher to a non-profit entity controlled by and used to benefit Defendant or she attempts to redeem the change.

16.

If the player elects to attempt to redeem her change, the Kiosk then generates a TRU Ticket that represents the amount of change that was not paid out. For example, if a player inserts a Gaming Voucher for $1.35, the Kiosk pays a single dollar and generates a TRU Ticket for the balance of 35 cents. That TRU Ticket is more often than not a vehicle for converting players' funds into Casino funds.

17.

The TRU Ticket is not cash and has no value outside of the casino. Upon information and belief, the TRU Ticket can only be cashed at the main cashier's window, commonly referred to as the casino "Cage."

=

18.

There are no signs posted saying that Defendants do not pay change at the Kiosks. There is no notice on the TRU Ticket that it can only be cashed at the Cage. In fact, the TRU Ticket says:

> Ticket VOID after 30 days and will not be cashed. Must be redeemed in person. This ticket is a bearer instrument, meaning the person who possesses it is presumed to be entitled to cash it. The Casino indicated on this ticket is not responsible for lost or stolen tickets. The player is responsible for checking this ticket for accuracy, including the date and amounts shown, and must immediately notify an attendant of any error. Tickets are void if illegible, altered, counterfeit, incomplete, produced in error, or fail any validation testing. The Casino indicated on this ticket shall not be responsible for the issuance, validation, or payment of lost, stolen, illegible, altered, counterfeit, incomplete, erroneous, invalid, or multiple tickets. The Casino indicated on this ticket shall be discharged from any and all liability upon payment of any claim arising from the redemption of the first ticket presented with a valid bar code. The Casino indicated on this ticket reserves the right to withhold validation and payment pending a determination whether the ticket has been stolen or lost. Ticket valid only at Casino indicated on this ticket.

19.

At some of the Defendant's Casinos, the Kiosk allows a player to "donate" her change to a non-profit controlled by Defendant, or to forfeit the change. This has the same eventual effect of depriving the player of her money. The non-profit that receives these player funds is MGM Resorts Foundation (the "Foundation"). It is wholly controlled by Defendant as four of the five board members are officers or directors of MGM Resorts International (the "MGM Members"). The MGM Members of the Foundation were also the Executive Director of Community Engagement, the Vice President – Diversity, Equity, and Inclusion, the Vice President of Human Resources, and the Director of Philanthropy and Community Engagement for MGM Resorts International. During the COVID-19 pandemic, Defendant furloughed thousands of employees. Many of these employees received grants from the Foundation to assist with bills during this time of Covid furlough. In fact, over 80% of the funds issued by the Foundation in 2020, were issued to furloughed employees of the Casinos, and a majority of those funds appear to have been raised

=

through the Kiosk donations. Based on review of Internal Revenue Service (the "IRS") Form 990s as far back as publicly available on the IRS's website, grants made by the Foundation to individuals prior to 2020 were non-existent. These grants to Covid-furloughed employees directly benefited the Casinos as it allowed the furloughed employees additional time before seeking other employment. As a result, the Casinos were able to bring the furloughed employees back instead of initiating the arduous and expensive process of recruiting, interviewing, hiring, and training new employees. The Casinos effectively kept the purported donations as a substantial and not incidental private benefit. This is further evidenced by the lack of issuance of an acknowledgement of the donation, as would commonly be issued by non-profits receiving donations and in contrast to the Casinos' regular issuance of tax information in the form of Win/Loss statements.

20.

The MGM Casinos fail to put an average player on reasonable notice that the TRU Ticket can *only* be converted into cash at the Cage.

21.

On June 14, 2022, Plaintiff checked into the Beau Rivage Resort and Casino, a property owned and operated by Defendant.

22.

Plaintiff chose to play the penny slot machine on the casino floor at the Beau Rivage. She inserted $40.00 and played for a while. When she no longer wished to play, she pushed the "Cash Out" button on the machine and received a Gaming Voucher in the amount of $18.19.

23.

Plaintiff took the Gaming Voucher to the Kiosk and cashed out. The Kiosk paid her $18.00 and generated a TRU Ticket in the amount of $0.19.

=

24.

Unaware that the TRU Ticket could be redeemed at the cage, due to the Casino's intentional obfuscation, Plaintiff left the Casino, incurring damages after the ticket expired 30 days later.

25.

On the same day, Plaintiff visited other casinos not operated by Defendant where she was paid exact change at the kiosk.

26.

Upon information and belief, Plaintiff is similarly situated with hundreds of thousands of Casino patrons who have been deprived, little by little, of millions of dollars since Defendant's adoption of its no-change policy.

**FIRST CAUSE OF ACTION – BREACH OF CONTRACT**

27.

Plaintiff reasserts and realleges all of the foregoing paragraphs as if copied herein.

28.

When Plaintiffs converted their funds into credits, they accepted the offer of the Casino to enter into a contract whereby the Plaintiffs could risk their funds in a game of luck and that at the end of the gaming, the players would be able to cash out their funds.

29.

By concealing the sole method available for cashing out a TRU Ticket or compelling a "donation" of change, the Casinos breached this contract, prohibiting the Plaintiffs from cashing out their gaming credits as originally agreed. The Casinos changed the decades-long practice whereby players could redeem their Gaming Vouchers at a Kiosk for full change. They did this – explicitly – to preserve change and increase profits. They made this change to take advantage of

=

players, knowing that if they made it unclear and too inconvenient, time consuming, and cumbersome for players to redeem their change, the Casinos would ultimately retain those winnings.

## SECOND CAUSE OF ACTION – CONVERSION

30.

Plaintiff reasserts and realleges all of the foregoing paragraphs as if copied herein.

31.

By depriving Plaintiffs of a way to exchange their gaming credits for cash, the Casinos took possession of and dominion over Plaintiffs' property in derogation of their rights. The Casinos concealed the manner for recovering change and made it logistically impossible and logically improbable that thousands of players would wait in line at the cage to retrieve their change – if they even knew they could do so.

32.

Plaintiffs were correspondingly damaged in the amounts converted.

## ALTERNATIVE CAUSE OF ACTION – UNJUST ENRICHMENT

33.

Plaintiff reasserts and realleges all of the foregoing paragraphs as if copied herein.

34.

In the alternative, Defendant is in possession of money which in good conscience and justice it should not retain but should deliver to Plaintiffs.

35.

In good conscience, the funds retained by Defendant ought to belong to Plaintiff.

=

## ALTERNATIVE CAUSE OF ACTION – QUANTUM MERUIT

36.

Plaintiff reasserts and realleges all of the foregoing paragraphs as if copied herein.

37.

In the alternative, Defendant is liable under a theory of quantum meruit. Valuable materials (funds) were rendered to Defendant; they were accepted, used, and enjoyed by Defendant; and Defendant was reasonably notified that Plaintiffs expected to be paid.

WHEREFORE, Leane Scherer prays that summons be issued and served on Defendant, that hearing be set on class certification as required by law, that this matter be certified as a class action, and after due proceedings herein, there be judgment in favor of Plaintiff and all Class Members and against Defendant, including attorney's fees and costs.

Respectfully submitted:

**STERNBERG, NACCARI & WHITE, LLC**

____/s/ M. Suzanne Montero_____.
SCOTT L. STERNBERG, (PHV)
M. SUZANNE MONTERO, (PHV)
KEITH J. NACCARI (PHV)
GRAHAM H. WILLIAMS, (PHV)
935 Gravier Street, Suite 2020
New Orleans, Louisiana 70112
Telephone: 504.324.2141
Fax: 504.534.8961
scott@snw.law | suzy@snw.law | keith@snw.law | graham@snw.law

AND

RYAN J. RICHMOND (MSBN 106198)
251 Florida Street, Suite 203
Baton Rouge, LA 70801-1703
Tel.: (225) 412-3667
Fax: (225) 286-3046
ryan@snw.law

=

AND

LAWRENCE J. CENTOLA, III La. Bar No 27402[1]
JASON Z. LANDRY La. Bar No 33932[2]
MARTZELL BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130
Telephone: (504) 581-9065
   Email:  ljc@mbfirm.com
         jzl@mbfirm.com

*Counsel for Plaintiff*

---

[1] Motion for admission *pro hac vice* to be filed.

[2] Motion for admission *pro hac vice* to be filed.

=