**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**LEANE SCHERER,** *individually and*                           **PLAINTIFF**
*on behalf of all others similarly*
*situated*


**v.**                                                    **Civil No. 1:22cv258-HSO-BWR**


**MGM RESORTS INTERNATIONAL**                                  **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT MGM
RESORTS INTERNATIONAL'S MOTION [16] TO DISMISS**</u>

BEFORE THE COURT is Defendant MGM Resorts International's Motion

[16] to Dismiss. The Motion [16] is fully briefed. After due consideration of the

parties' filings and relevant legal authority, the Court finds that Defendant MGM

Resorts International's Motion [16] to Dismiss should be granted, and that this civil

action should be dismissed without prejudice for lack of subject-matter jurisdiction.

## I. <u>BACKGROUND</u>

A.     <u>Procedural history</u>

On September 21, 2022, Plaintiff Leane Scherer, individually and on behalf of

all others similarly situated ("Plaintiff" or "Scherer"), filed a Complaint [1] in this

Court, advancing state-law claims for breach of contract, conversion, unjust

enrichment, and quantum meruit against Defendant MGM Resorts International

("Defendant" or "MGM"). Compl. [1]. Plaintiff invokes this Court's diversity

jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and has since amended her Complaint [1]. *See* Am. Compl. [14].

Defendant operates several casinos across the United States, including the Beau Rivage Resort and Casino ("Beau Rivage") in Biloxi, Mississippi. *Id.* at 1-2. The allegations in the Amended Complaint [14] arise from the cash-out system utilized at Defendant's casinos for players who gamble on slot machines. *See generally id.* To gamble on a slot machine, a player must pay for credits, typically by inserting cash into the machine. *Id.* at 3-4. Those credits are then "chanced" by the player by pressing a button or pulling a lever to see if the machine will generate a winning combination. *Id.* at 4. A winning player receives additional credits, otherwise the chanced credits are lost. *Id.* Assuming that a player seeks to stop playing before she loses all of her credits, she can "cash out" on the slot machine by selecting the appropriate button. *Id.* Upon cashing out, the slot machine prints a voucher that converts the remaining credits into dollars and cents and that displays the corresponding amount. *Id.* A player can then take this voucher to a kiosk to receive her actual payment. *Id.* at 5.

Plaintiff's central complaint is that Defendant's kiosks will only dispense cash. *Id.* at 5-6. Accordingly, when a player inserts the voucher printed from a slot machine into the kiosk, the kiosk rounds down to the nearest dollar and pays that amount in cash. *Id.* at 6. A player is then given the option to either donate the leftover change to the MGM Resorts Foundation, a 501(c)(3) foundation controlled by Defendant, or to "attempt[] to redeem the change." *Id.* If a player wishes to

redeem her change, the kiosk prints another voucher, known as a "TRU Ticket,"[1] which a player can take to the casino's main cashier's window, commonly called the "cage," to redeem for the corresponding amount of cents. *Id.* Prior to the implementation of the TRU Ticket system, the kiosks dispensed coins in addition to cash. *Id.* at 5. However, Defendant changed this practice during the COVID-19 pandemic, citing a coin shortage, and now the sole method for obtaining coins upon cashing out of a slot machine is to follow this multistep process of receiving a voucher from the machine followed by a TRU Ticket from the kiosk and then redeeming the TRU Ticket at the cage. *Id.* at 4-6. Plaintiff alleges that this TRU Ticket system is "a vehicle for converting players' funds into Casino funds" because Defendant does not provide adequate notice to players on how to redeem their coins, and that some of the donated funds were improperly used to provide financial support to furloughed MGM employees during the COVID-19 pandemic. *Id.* at 6-8.

On June 14, 2022, Plaintiff visited the Beau Rivage and decided to play a penny slot machine in the casino. *Id.* at 8. She inserted $40.00 into the machine and later cashed out with $18.19 remaining. *Id.* Based on the cash-out policy at Defendant's casinos, Plaintiff received a voucher for $18.19 and placed it into a kiosk. *Id.* The kiosk paid her $18.00 and printed a TRU Ticket for the remaining $0.19. *Id.* Plaintiff asserts that she was "[u]naware that the TRU Ticket could be

---

[1] Plaintiff refers to these vouchers as "TRU Tickets," Am. Compl. [14] at 6, while Defendant calls them "Tru Tickets," *see* Mem. [17] at 1; Ex. [21] at 2. For purposes of the present Order, the Court will use Plaintiff's manner of capitalization.

redeemed at the cage," and left the Beau Rivage without obtaining her $0.19. *Id.* at 8-9.

Plaintiff now has filed suit against Defendant on behalf of herself and "hundreds of thousands of Casino patrons who have been deprived, little by little, of millions of dollars since Defendant's adoption of its no-change policy." *Id.* at 9. She alleges that Defendant's cash-out system breaches a contract between the casino and its players by "prohibiting the [players] from cashing out their gaming credits as originally agreed." *Id.* In addition, she asserts that Defendant's actions constitute conversion by "conceal[ing] the manner for recovering change and ma[king] it logistically impossible and logically improbable that thousands of players would wait in line at the cage to retrieve their change." *Id.* at 10. In the alternative, Plaintiff raises claims for unjust enrichment and quantum meruit. *Id.* at 10-11. In total, Plaintiff claims that the TRU Ticket system has led to over $5,000,000.00 in cents being unlawfully obtained or retained by Defendant. *Id.* at 2, 9-11.

B.    The present Motion [16]

Defendant has filed the present Motion [16] to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), raising two challenges to this Court's subject-matter jurisdiction and alternatively contending that Plaintiff has failed to state a claim for relief. Mot. [16] at 1. Regarding the jurisdictional challenges, Defendant first argues that the amount-in-controversy does not exceed $5,000,000.00 as is required to establish jurisdiction under CAFA, Mem. [17] at 13; 28 U.S.C. § 1332(d)(2), and it has submitted two Exhibits [16-2], [21] in support of

4

this position. In addition, MGM contends that Plaintiff's claims seek payment of a gaming debt which is void and unenforceable in Mississippi courts and can only be addressed by the Mississippi Gaming Commission. Mem. [17] at 10 (citing Miss. Code Ann. § 75-76-157). As a result, this Court cannot hear Plaintiff's claims because Mississippi courts would also lack jurisdiction over them. *Id.* at 10-12.

As for its merits challenge, Defendant maintains that: (1) the alleged facts do not demonstrate the existence of a contract that was breached; (2) Plaintiff did not make a claim of title over the change and therefore cannot claim conversion; (3) her quantum meruit claim is meritless because she does not allege that she provided goods or services that went unpaid; and (4) Defendant was not unjustly enriched because Plaintiff does not allege an implied-in-law promise. *Id.* at 15-22. Finally, MGM requests that the Court strike Plaintiff's proposed class definition as unascertainable because it requires determining whether each class member did not redeem the coin value of their TRU Tickets based upon a lack of knowledge, a desire to donate the change, or some other reason. *Id.* at 4-5, 23-24.

Plaintiff's Response [28] counters that Mississippi law cannot deprive this Court of federal diversity jurisdiction by granting exclusive jurisdiction to the Mississippi Gaming Commission, Mem. [28] at 1-3, and to the extent that Mississippi law creates an administrative exhaustion requirement, it cannot be jurisdictional and compliance should be excused as futile and inadequate, *id.* at 4-6. Next, Plaintiff asserts that it is facially apparent from the Amended Complaint [14] that the putative class's claims exceed $5,000,000.00 due to the number of members

and the damages sought. *Id.* at 7-9. In further support of her position, Plaintiff cites to a news article stating that $22,000,000.00 went unclaimed at casinos in Las Vegas in 2022, and to MGM's 2021 Securities and Exchange Commission Annual Report to demonstrate the amount of gambling that occurred at Defendant's casinos. *Id.* at 8. She also argues that the evidence submitted by Defendant is insufficient and unreliable. *Id.* at 9-11.

On the merits, Plaintiff asserts that "[t]he kiosks are a service that the casino patron is aware of and relies upon" and are "an implied term of the contract" of gambling, and that Defendant breached this contract by not providing coins at the kiosk or giving sufficient notice of where to redeem the TRU Tickets. *Id.* at 12-13. Plaintiff further claims that MGM breached a contract with the players who chose to donate their money to the MGM Resorts Foundation because some of that money ultimately went to furloughed MGM employees. *Id.* at 13-14. She also rejects Defendant's argument that her claim for conversion required a demand for return, stating that its withholding of her change was sufficient for conversion. *Id.* at 14. Finally, Plaintiff disputes Defendant's other claims as to the sufficiency of her pleadings. *Id.* at 14-15.

Defendant replies that Plaintiff's appeal to futility of the administrative process is foreclosed by the relevant statute itself, Reply [32] at 3, and it challenges the relevancy of Plaintiff's evidence regarding the amount in controversy, stating that her exhibits do not reveal the value of the unclaimed TRU Tickets, each of which is less than a dollar, *id.* at 4-5. In response to Plaintiff's implied contract

theory, Defendant maintains that the customary method to cash out at a casino is at the cage so any implied contract would involve redeeming change in the manner that Defendant has established, *id.* at 9, and that Plaintiff lacks any claim about donations because she does not allege that she ever donated to the MGM Resorts Foundation at a kiosk, *id.* Moreover, Defendant asserts that "providing grants to persons who have lost their jobs because of a worldwide pandemic is charitable," and that the kiosks clearly indicated that the donations were directed to its Foundation, such that players were not misled. *Id.* (emphasis removed).

## II. DISCUSSION

### A.   Legal standard

Defendant's Motion [16] challenges this Court's subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), and whether Plaintiff has stated a claim for relief pursuant to Rule 12(b)(6). A Rule 12(b)(1) motion should be granted "if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction." *Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009) (quotation omitted). In reviewing a Rule 12(b)(1) motion, a court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). A court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996));

*Stratta v. Roe*, 961 F.3d 340, 349 (5th Cir. 2020). Here, the Court will consider the exhibits submitted by the parties, and will resolve Defendant's jurisdictional challenges based on the Amended Complaint [14], the undisputed facts in the record, and the Court's resolution of disputed facts.

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," and the facts alleged must be more than "merely consistent with a defendant's liability." *Id.* (quotation omitted). A court must accept all well-pleaded facts as true, view them in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Johnson v. BOKF Nat'l Ass'n*, 15 F.4th 356, 361 (5th Cir. 2021). However, a complaint's legal conclusions are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680.

When "considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). A district court may also rely on "any documents the pleadings mention that are central to the plaintiff's claims" when a party files such documents with its motion or response. *In re GenOn Mid-Atl. Dev., L.L.C.*, 42 F.4th 523, 546 (5th Cir. 2022)

(citing *Collins*, 224 F.3d at 498-99); *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

B.   <u>Order of determining Defendant's jurisdictional challenges</u>

When presented with jurisdictional and merits-based challenges, "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007). Where multiple jurisdictional questions are raised, "there is no mandatory 'sequencing of jurisdictional issues,'" and "a federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" *Id.* at 431 (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85 (1999)).

Here, both of Defendant's jurisdictional arguments implicate this Court's subject-matter jurisdiction: (1) a challenge to whether it has diversity jurisdiction over this case under CAFA based on the amount in controversy;[2] and (2) a claim-based challenge asserting that disputes over gaming debts cannot be heard in

---

[2] Plaintiff's Amended Complaint [14] also claims that the Court has subject-matter jurisdiction under the ordinary diversity jurisdiction statute, 28 U.S.C. § 1332(a). Am. Compl. [14] at 2. It is facially apparent that the amount in controversy set forth in § 1332(a) is not satisfied here as the only allegations as to the possible recovery for any individual class member are Plaintiff's claim that she was unable to redeem her TRU Ticket worth $0.19. *See id.* at 8-9; § 1332(a) (noting amount in controversy must exceed $75,000.00). To the extent Plaintiff attempts to satisfy § 1332(a)'s amount in controversy requirement by aggregating the potential recoveries of all class members, she cannot do so. *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 324 n.6 (5th Cir. 2008) ("[T]he potential recoveries of class members may not be aggregated to satisfy the 1332(a) amount-in-controversy requirement." (citing *Grant v. Chevron Phillips Chem. Co.*, 309 F.3d 864, 873 (5th Cir. 2002)). Aggregation is proper only if the members assert a common and undivided right, which is not at issue here, *id.*, or pursuant to CAFA's provisions, *id.* at 324.

courts, whether in Mississippi state courts or a federal court, and are instead within the exclusive jurisdiction of the Mississippi Gaming Commission. Defendant takes the position that the Court should address the latter question first.

In determining which of these jurisdictional grounds to address first, the Court considers "the complexity of the subject-matter jurisdiction issues raised by the case, as well as concerns of federalism, and of judicial economy and restraint." *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 100 (5th Cir. 2018). Although addressing the exclusive jurisdiction challenge requires the Court to consider issues of Mississippi state law, existing case law from Mississippi courts provides clear guidance on the jurisdictional question such that it is relatively straightforward. *See, e.g.*, *Grand Casino Tunica v. Shindler*, 772 So. 2d 1036, 1038 (Miss. 2000). In contrast, the question regarding the amount in controversy is a fact-based inquiry that involves consideration of several exhibits, and requires the Court to make a finding "to a legal certainty that the claim is really for less than the jurisdictional amount." *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995). Consequently, the Court will first consider whether the statutes governing Mississippi gaming law foreclose its subject-matter jurisdiction over Plaintiff's claims.

C.    Whether Plaintiff's failure to seek relief from the Mississippi Gaming Commission prohibits this Court from exercising subject-matter jurisdiction over her claims

1.    Whether Plaintiff's claims fall within the Mississippi Gaming Commission's exclusive jurisdiction

Under diversity jurisdiction, the Court must apply the law of the forum state, Mississippi, and having done so it finds that it lacks subject-matter jurisdiction due to the Mississippi Gaming Control Act, Miss. Code Ann. § 75-76-1 et seq., which provides that claims such as Plaintiff's for gaming debts can only be heard by the Mississippi Gaming Commission.

Mississippi Code Annotated § 75-76-157 states that:

(1) Except as provided in Sections 75-76-159 through 75-76-165, inclusive, gaming debts not evidenced by a credit instrument are void and unenforceable and do not give rise to any administrative or civil cause of action.
(2) A claim by a patron of a licensee for payment of a gaming debt not evidenced by a credit instrument . . . shall be resolved by the executive director [of the Mississippi Gaming Commission] in accordance with Sections 75-76-159 through 75-76-165, inclusive. The resolution of such a claim or dispute by the executive shall include any claim for alleged winnings or losses . . . .

Miss. Code Ann. § 75-76-157. Neither party disputes that Plaintiff's claims address a gaming debt covered by the statute. *See* Mem. [17] at 10-12; Mem. [28] at 2; *see also Shriver v. Boyd Biloxi LLC*, 281 So. 3d 63, 68-69 (Miss. Ct. App. 2019) (holding that cash-out vouchers qualify as gaming debts under Miss. Code Ann. § 75-76-157).[3]

---

[3] Neither party addresses whether these vouchers are considered "credit instruments," and *Shriver* does not discuss this additional requirement for gaming debts to fall within the Gaming Commission's authority. *See Shriver*, 281 So. 3d at 68-69 (determining that "[t]he vouchers qualify as 'gaming debts'"). However, the Gaming Control Act defines a "credit instrument" as "a writing which evidences a gaming debt owed to a person who holds a license at the time the debt is created, and

The Mississippi Supreme Court has held that under this statute, "all gaming matters" are within "the exclusive jurisdiction of the Mississippi Gaming Commission," *Grand Casino Tunica*, 772 So. 2d at 1038, and the Gaming Commission, not Mississippi state courts, is "the only body with jurisdiction to hear" disputes over gaming debts, *id.* at 1040. In fact, as the statute states, claims regarding gaming debts are "void and unenforceable" except through the Gaming Commission's administrative process. Miss. Code Ann § 75-76-157(1); *Grand Casino Tunica*, 772 So. 2d at 1039 ("[T]he Gaming Control Act does allow for recovery of a gaming debt, **but** only through the Gaming Commission's administrative process." (emphasis in original)). Under this framework, the only jurisdiction that Mississippi state courts have over gaming debts is judicial review of a decision by the Gaming Commission. *See Grand Casino Tunica*, 772 So. 2d at 1039-41; *Shriver*, 281 So. 3d at 67-70; Miss. Code Ann. § 75-76-167.

Thus, a Mississippi state court would lack jurisdiction over Plaintiff's claims if they were initially filed in their present form, that is without proceeding through the Gaming Commission's administrative process. *See Grand Casino Tunica*, 772 So. 2d at 1039-41; *Shriver*, 281 So. 3d at 67-70; *see Cook v. Mardi Gras Casino Corp.*, 697 So. 2d 378, 381, 383 (Miss. 1997) (affirming a state circuit court's

---

includes any writing taken in consolidation, redemption or payment of a prior credit instrument." Miss. Code Ann. § 75-76-5(g). Therefore only debts in writing that are owed to a license holder are "evidenced by a credit instrument." *See* Miss. Code Ann. § 75-76-5(g), 75-76-157. The statute defines a license as a "a gaming license or a manufacturer's, seller's or distributor's license." Miss. Code Ann. § 75-76-5(s). Plaintiff does not claim that she holds such a license. *See generally* Am. Compl. [14]. As a result, the Court finds that the vouchers are gaming debts not evidenced by a credit instrument.

dismissal for lack of jurisdiction because the plaintiff "failed to exhaust her administrative remedies" under the Gaming Control Act).

Because this Court, sitting in diversity, must apply state substantive law, it lacks jurisdiction over a Mississippi state-law claim where all Mississippi state courts would find that they likewise lack jurisdiction over the same claim. *See Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 169 (5th Cir. 2014). Plaintiff is not seeking judicial review of the Gaming Commission's administrative process, but instead asks this Court to adjudicate the merits of her dispute over gaming debts in the first instance.[4] *See generally* Am. Compl. [14]. No Mississippi state court could hear this dispute, *see Grand Casino Tunica*, 772 So. 2d at 1039-41; *Shriver*, 281 So. 3d at 67-70; Miss. Code Ann. § 75-76-167, and, as such, this Court lacks subject-matter jurisdiction over these claims, *see, e.g.*, *Jones v. Grinnell Corp.*, 235 F.3d 972, 974-75 (5th Cir. 2001) (dismissing Texas state law claims for lack of subject-matter jurisdiction where the plaintiff had not exhausted all state administrative remedies prior to bringing a civil action as jurisdictionally required by state law), *superseded by change in Texas state law*, *In re: United Servs. Auto. Ass'n*, 307 S.W.3d 299, 311 (Tex. 2010), *as recognized in Gorman*, 753 F.3d at 169-70.

---

[4] The Court's findings here are limited to the situation presently before it, specifically where a plaintiff has not first proceeded through the Gaming Commission's full administrative process. It need not and does not address whether a federal court would have jurisdiction to review the Gaming Commission's decision. *See* Miss. Code Ann. § 75-76-167 (providing that an aggrieved person "may obtain judicial review" of "a final decision or order of the commission" in the circuit court of the county where the dispute arose).

2. <u>Whether Mississippi law can restrict Plaintiff's state-law claims originally filed in federal court to the Gaming Commission</u>

Plaintiff asserts that federal subject-matter jurisdiction cannot be limited by state statute, citing to *Tercero v. Tex. Southmost Coll. Dist.*, 989 F.3d 291, 298 (5th Cir. 2021). Mem. [28] at 3. In *Tercero*, the Fifth Circuit stated that "[f]ederal jurisdiction cannot be defeated by a state statute limiting the forum in which the action must be brought," 989 F.3d at 298, however, the context of that statement is inapposite to the present situation. Specifically, *Tercero* addressed an attempt by a state to "bar a federal court from exercising jurisdiction *over claims that state courts would recognize and enforce.*" *Id.* at 297 (emphasis added). Here, Mississippi state courts would not recognize or enforce Plaintiff's claims in their present posture. *See Grand Casino Tunica*, 772 So. 2d at 1039-41; *Shriver*, 281 So. 3d at 67-70; *Cook*, 697 So. 2d at 381, 383; Miss. Code Ann. § 75-76-167 ("Except as provided in Sections 75-76-159 through 75-76-165, inclusive, gaming debts not evidenced by a credit instrument are void and unenforceable and do not give rise to any administrative or civil cause of action.").

Mississippi's restriction of gaming debt disputes to the jurisdiction of the Gaming Commission is not an attempt to specifically restrict federal courts' ability to hear such claims. *Cf. Tercero*, 989 F.3d at 297-98 (noting that a state "cannot condition" legal rights "on a suit being brought in any forum other than a federal forum" but can condition them "on jurisdictional prerequisites" to filing suit). Instead, Mississippi has statutorily prohibited all courts from hearing these claims except in the circumstances of judicial review of the Gaming Commission's

14

decisions. *See Grand Casino Tunica*, 772 So. 2d at 1038-41; Miss. Code Ann. § 75-76-167. Because Mississippi law treats all courts equally in providing that these claims "do not give rise to any administrative or civil cause of action," this Court lacks subject-matter jurisdiction over them. *See* Miss. Code Ann. § 75-76-167; *Jones*, 235 F.3d at 974-75.[5]

Plaintiff next contends that, to the extent Mississippi law creates an administrative exhaustion requirement, it is unenforceable in federal court because "[a]n administrative exhaustion requirement 'is jurisdictional in nature only if Congress statutorily mandates that a claimant exhaust administrative remedies.'" Mem. [28] at 3 (quoting *Caldera v. Ins. Co. of the State of Pa.*, 716 F.3d 861, 867 n.11 (5th Cir. 2013)). However, this applies only when the claim at issue involves a claim under federal law, as in *Caldera. See* 716 F.3d at 862-64 (noting that the plaintiff's claim was brought under the Medicare Secondary Payer Statute). Where, as here, the substantive claims instead arise purely under state law with an administrative exhaustion requirement, a federal court asks whether, under the state's law, failure to exhaust administrative remedies is a jurisdictional defect. *Gorman*, 753 F.3d at 169. If the state law considers the administrative process a jurisdictional bar to its courts hearing the claims, and a plaintiff has not first

---

[5] The Court notes that a district court in the Northern District of Mississippi rejected a Rule 12(b)(1) challenge that was based on an argument that the Gaming Commission had exclusive jurisdiction over trespass to chattels and conversion claims. *See Grosch v. Tunica Cnty.*, 569 F. Supp. 2d 676, 679-80 (N.D. Miss. 2008). However, the district court in *Grosch* specifically held that the claims before it did not involve gaming debts, *id.*, and at least one circuit court in Mississippi has specifically rejected *Grosch*'s jurisdictional determination in the context of cash out vouchers, *Shriver v. Boyd Biloxi, LLC*, No. A2402-2016-172, 2018 WL 11473701, at *4, 6 (Miss. Cir. Ct. Jan. 18, 2018), *aff'd*, 281 So. 3d 63 (Miss. Ct. App. 2018).

exhausted that process, this Court faces the same jurisdictional bar and must dismiss for lack of subject-matter jurisdiction. *Jones*, 235 F.3d at 975.

The Mississippi Supreme Court has consistently held that where a claim addresses gaming debts, the Gaming Commission process is jurisdictional. *See Grand Casino Tunica*, 772 So. 2d at 1039; *Ameristar Casino Vicksburg, Inc. v. Duckworth*, 990 So. 2d 758, 759 (Miss. 2008); *Cook*, 697 So. 2d at 381, 383. Based on the Fifth Circuit's guidance, if the Court construes Mississippi gaming law as setting up an administrative exhaustion requirement as Plaintiff argues, a failure to exhaust will jurisdictionally bar Plaintiff's claims so long as Mississippi law considers it as a jurisdictional requirement. *See Jones*, 235 F.3d at 974-75; *Gorman*, 753 F.3d at 169-70. Because Mississippi courts have uniformly treated the Gaming Commission's process as jurisdictional, *see Grand Casino Tunica*, 772 So. 2d at 1039; *Ameristar Casino Vicksburg, Inc.*, 990 So. 2d at 759; *Shriver*, 281 So. 3d at 68-69, this Court must do the same. Plaintiff does not allege that she has proceeded through the Gaming Commission's administrative process, and as a result, the Court lacks jurisdiction over her claims.

3.   <u>Whether Plaintiff should be excused from the Gaming Commission's administrative process due to futility or inadequacy</u>

Finally, Plaintiff argues that the Court should nevertheless waive any exhaustion requirement because it would have been futile or inadequate. Mem. [28] at 4. But the exhaustion requirement here is jurisdictional, and futility or inadequacy exceptions typically do not apply to jurisdictional exhaustion requirements. *See Gardner v. Sch. Bd. Caddo Par.*, 958 F.2d 108, 111-12 (5th Cir.

1992) ("We do not decide whether exhaustion is a jurisdictional requirement. Quite arguably, it is not because there is a judicial exception to exhaustion when exhaustion would be futile or inadequate."); *Weinberger v. Salfi*, 422 U.S. 749, 766 (1975) (noting that "a statutorily specified jurisdictional prerequisite" cannot "be dispensed with merely by a judicial conclusion of futility").

While Plaintiff points to various exhaustion requirements that apply to other types of claims and that can be excused due to futility or inadequacy, *see* Mem. [28] at 4-5, she has not provided any authority to suggest that Mississippi law recognizes a futility or inadequacy exception to the jurisdictional requirement for claims involving gaming debts, and the Court has found none. In light of the foregoing discussion, the Court doubts that the Mississippi Supreme Court would recognize such an exception to this jurisdictional requirement. *See Grand Casino Tunica*, 772 So. 2d at 1039-41 ("[T]he Gaming Control Act does allow for recovery of a gaming debt, **but** only through the Gaming Commission's administrative process." (emphasis in original)); *Cook*, 697 So. 2d at 381, 383 (stating that "the Circuit Court was statutorily barred from consideration of the case" because the plaintiff "failed to exhaust her administrative remedies" under the Gaming Control Act); Miss. Code Ann. § 75-76-167 ("Except as provided in Sections 75-76-159 through 75-76-165, inclusive, gaming debts not evidenced by a credit instrument are void and unenforceable and do not give rise to any administrative or civil cause of action.").

Even if the failure to exhaust could be excused due to futility or inadequacy, such exceptions do not apply to the present case. Plaintiff first asserts inadequacy

17

based on the lack of a class action mechanism before the Gaming Commission.
Mem. [28] at 5. She has not cited to any authority for the proposition that
administrative remedies are inadequate because they do not permit class actions. In
other statutes which require administrative exhaustion, at least the class
representative must first exhaust her administrative remedies before bringing a
class action in federal court, *see Gates v. Cook*, 376 F.3d 323, 329-30 (5th Cir. 2004)
(PLRA); *Harris v. Trustmark Nat'l Bank*, 287 F. App'x 283, 294 (5th Cir. 2008)
(ERISA), so this does not excuse Plaintiff for failing to exhaust administrative
remedies.

Plaintiff also takes the position that the Gaming Commission's remedies are
inadequate because "[i]f successful, Ms. Scherer would have been awarded her
change and nothing more, allowing Defendant's flagrant conduct to go completely
unchecked," Mem. [28] at 5, but it is unclear what remedies besides her change she
would be entitled to before *this Court*. Based on the Court's reading of the Amended
Complaint [14], she is not seeking an injunction or other remedy besides monetary
compensation, Am. Compl. [14] at 9-11 ("Plaintiffs were correspondingly damaged
in the amounts converted."; "[T]he funds retained by Defendant ought to belong to
Plaintiff."), nor has she explained how this Court would have the authority to order
Defendant to start dispensing coins at its kiosks or posting whatever notice she
believes is necessary according to an implied contract of gambling. Plaintiff has not
shown how the Gaming Commission would be unable to provide her with the

remedy she seeks here, and, as such, the Court cannot find that the state administrative process is futile or inadequate.

In light of the foregoing, the Court finds that it lacks subject-matter jurisdiction over Plaintiff's claims because the Gaming Commission has exclusive jurisdiction over such disputes in Mississippi, and Plaintiff has not exhausted the Gaming Commission's administrative process. *See Grand Casino Tunica*, 772 So. 2d at 1039-41; Miss. Code Ann. § 75-76-167; *Gorman*, 753 F.3d at 169-70.

D.   Whether the putative class satisfies CAFA's amount in controversy requirement

Even if the Court found that Plaintiff's claims were not barred by the Gaming Commission's exclusive jurisdiction, it would nevertheless find that it lacks subject-matter jurisdiction because the requisite amount in controversy is not satisfied. CAFA provides that "[t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action" where "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2). There is no dispute that the diversity of citizenship requirement is satisfied here, as Plaintiff is a citizen of Louisiana, and MGM is a citizen of Delaware and Nevada. *See* Am. Compl. [14] at 1-2. Defendant disputes whether the amount in controversy exceeds $5,000,000.00. Mem. [17] at 13-15.

Where, as here, a plaintiff alleges that the amount in controversy exceeds the requisite amount, "it [must] appear to a legal certainty that the claim is really for less than the jurisdictional amount" in order for a court to dismiss for lack of

subject-matter jurisdiction. *Allen*, 63 F.3d at 1335. This legal certainty requirement is satisfied where the allegations and the evidence demonstrate that the claims "never could have amounted to the sum necessary to give jurisdiction." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 290 (1938); *see, e.g., Burns v. Anderson*, 502 F.2d 970, 972 (5th Cir. 1974) (finding legal certainty that the amount in controversy was not satisfied where the plaintiff claimed $1,026.00 in lost wages and additional damages for pain and suffering in excess of the jurisdictional amount, but the evidence showed that the plaintiff's medical bills were less than $250.00, he had minimal pain from the injuries, and his salary demonstrated that "it [was] difficult to see how [lost wages] could have amounted to even $300.00"); *Jones v. Malaco*, 2 F. Supp. 2d 880, 883-84 (S.D. Miss. 1998) (determining that "[t]o a legal certainty, defendant's act of not sending plaintiff his royalty check of $896.39 . . . does not justify a damage claim of the jurisdictional minimum of $50,000," where the plaintiff also sought noneconomic damages); *Evans v. Bulbhead*, No. 3:20-cv-324-DPJ-RHWR, 2021 WL 5751792, at *2 (S.D. Miss. Dec. 2, 2021) (finding the amount in controversy not satisfied where the plaintiff sought $20,000,000.00 in non-economic damages over a $37.87 unpaid debt).

Importantly, "jurisdiction is not conferred by the stroke of a lawyer's pen," and the party invoking the Court's jurisdiction bears the burden to support her allegations with specific facts as to the amount in controversy if challenged. *Diefenthal v. C. A. B.*, 681 F.2d 1039, 1052 (5th Cir. 1982); *Delor v. Intercosmos Med. Grp., Inc.*, Civil Action No. 04-3262, 2005 WL 8185620, at *1 (E.D. La. July 8,

2005). A court cannot "accept[] every claim of damages at face value, no matter how trivial the underlying injury," because it must ensure that it is not attempting to exercise jurisdiction over "petty controversies" which Congress sought to preclude from federal courts by establishing the amount in controversy requirement. *Diefenthal*, 681 F.2d at 1052.

It is legally certain that the amount in controversy over the TRU Tickets does not exceed $5,000,000.00.[6] Based on the Amended Complaint's [14] allegations, MGM "is liable to thousands of its casino players" and "hundreds of thousands of Casino patrons . . . have been deprived." Am. Compl. [14] at 1, 9. However, given that each TRU Ticket is worth $0.99 at most, there would need to be at least 5,050,506 TRU Tickets at issue in this case to satisfy the amount in controversy. *See* 28 U.S.C. § 1332(d)(2). And that 5,050,506 TRU Ticket number would only be sufficient if every TRU Ticket, besides Plaintiff's $0.19, was valued at $0.99, which is highly improbable. If, instead, each TRU Ticket was worth $0.19 like Plaintiff's, the class would need to contain 26,315,790 TRU Tickets to satisfy CAFA's amount in controversy. *See id.* Plaintiff herself asserts that there are only "thousands" of players at issue, Am. Compl. [14] at 1, 9; *see also* Mem. [28] at 2 (arguing that the

---

[6] The Court finds that any allegations or claimed losses due to donations on the kiosks to the MGM Resorts Foundation are not properly before it, and therefore it does not consider them in determining the amount in controversy. Plaintiff, who is the only named class member, does not allege that she made any donation to the MGM Resorts Foundation, and therefore she has not demonstrated any injury to her on this basis. *See generally* Am. Compl. [14]. "If none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants," such as by failing to demonstrate an actual injury from the challenged action, "none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). Accordingly, any grounds for relief based on the MGM Resorts Foundation cannot be sought by Plaintiff and cannot form part of the amount of controversy analysis.

dispute "impact[s] thousands of players across the country"), and by her own allegations, she only had one TRU Ticket, *see id.* at 8-9. Based on these claims, even if the "hundreds of thousands" of class members are 999,999 persons, on average each class member would need over five uncollected TRU Tickets worth $0.99, or about twenty-seven uncollected TRU Tickets if they were instead worth $0.19, in order for the putative class to exceed the $5,000,000.00 amount in controversy.

These figures alone demonstrate how wholly implausible it is for Plaintiff's allegations to satisfy the amount in controversy. Beyond that, Defendant has provided a sworn Declaration [21] from its Senior Vice President of Slot Strategy, Michael Gatten ("Gatten"), and a spreadsheet that documents how many TRU Tickets went uncollected at its casinos from July 1, 2020, to September 1, 2022. *See* Ex. [21] at 2-3, 5 (filed restricted access).[7] Gatten states that July 1, 2020, is the date when "most MGM casino kiosks stopped dispensing coins." *Id.* at 2 (filed restricted access).

According to Defendant's recording system for slot machine ticketing, which uses computers in the actual kiosks themselves to record data regarding the TRU Tickets, the expired total dollar value of TRU Tickets is $1,056,457.62 for that time

---

[7] The Court notes that the spreadsheet submitted by Defendant appears to contain a typographical error when compared to the Declaration. The Declaration states that the spreadsheet sets forth the number of TRU Tickets and the amount unrecovered, while the spreadsheet itself states that "[g]rand [t]otal of [e]xpired Tru Tickets" at the bottom and also indicates that it refers to "[v]oucher [v]alue >$1.00." *See* Ex. [21] at 2-3, 5 (filed restricted access). It is undisputed among the parties that TRU Tickets are vouchers valued at less than a dollar, so "voucher[s] value[d] >$1.00" would not be TRU Tickets, seeing as that would refer to vouchers worth more than a dollar. It appears that Defendant mistakenly used a "greater than" symbol in place of a "less than" notation based on the Declaration and the other portions of the spreadsheet noting that the figures address the TRU Tickets. *See id.* (filed restricted access); *see also* Reply [32] at 8 ("Exhibit [21] refers to expired vouchers worth less than a dollar.").

period. Ex. [21] at 2, 5 (filed restricted access). In his Declaration [21], Gatten acknowledges that two of MGM's casinos, the Borgata and Empire City casinos, use separate ticketing systems so he could only estimate the dollar value of the expired TRU Tickets at those locations, *id.* at 3 (filed restricted access), and the spreadsheet reflects that his estimations appear to be in line with MGM's casinos that have the highest amount of expired TRU Tickets, *see id.* at 5 (filed restricted access). In addition, the spreadsheet reflects that during the specified time period, 2,184,800 TRU Tickets expired. *Id.* (filed restricted access).

Considering Defendant's evidence along with the Court's separate determination regarding the amount and value of TRU Tickets that must have gone uncollected in order to satisfy the amount in controversy, the potential recovery for the putative class does not exceed $5,000,000.00. With only 2,184,800 TRU Tickets expired, even if every single voucher was valued at $0.99, which Plaintiff's personal alleged loss of a $0.19 TRU Ticket demonstrates is inconceivable, there would only be $2,162,952.00 at issue. Moreover, Gatten states that MGM's system of records for the TRU Tickets, along with his estimates for Borgata and Empire City, reflect that the actual value of these TRU Tickets is $1,056,457.62. Ex. [21] at 2-3, 5 (filed restricted access). Even if Gatten underestimated the value of the Borgata and Empire City TRU Tickets by a factor of twenty, the total value of the TRU Tickets still would not exceed $5,000,000.00.[8] Likewise, although the July 1, 2020, to

---

[8] Gatten estimates that the expired TRU Tickets at Borgata and Empire City collectively are worth $204,700.00, and represents that MGM's record system shows that the total unclaimed TRU Tickets for the other casinos are $851,757.62. *See* Ex. [21] at 5 (filed restricted access). Accordingly, even if the actual amount of TRU Tickets at issue from the Borgata and Empire City casinos were twenty

September 1, 2022 window omits fifty-seven days relevant to Plaintiff's allegations,[9]

to reach the amount in controversy requirement, within those fifty-seven days

players must have abandoned about four times the amount of TRU Tickets that

were unredeemed during the two years reported. Simply put, while there may be

some undercalculation of the TRU Tickets at issue, there is no justification for the

Court to presume that there are nearly $4,000,000.00-worth of unaccounted TRU

Tickets in MGM's records, as would be necessary for Plaintiff to satisfy the amount

in controversy requirement.

      In response to Defendant's exhibits, Plaintiff has also submitted some

exhibits, none of which alter the Court's conclusions. First, Plaintiff cites to a news

report stating that "gamblers [in Nevada] left $22 million in unclaimed tickets in

the fiscal year that ended June 30," 2022. Mem. [28] at 8; McKenna Ross, *Players

Let $22M in Cashout Tickets Expire Last Year. Where Did the Money Go?*, Las Vegas

Rev.-J. (Aug. 22, 2022, 2:22 PM), https://www.reviewjournal.com/business/casinos-

gaming/players-let-22m-in-cashout-tickets-expire-last-year-where-did-the-money-

go-2627329/. However, this article does not address the key question in this case,

---

times greater than Gatten's estimate, the total value of TRU Tickets at issue would only be
$4,945,757.62 (($204,700.00 x 20) + $851,757.62), still below the $5,000,000.00 amount in controversy.
[9] These days are from May 25, 2020, the day MGM's first casino reopened after closing due to
COVID-19, *see* Ex. [24-5] at 48, to July 1, 2020, and from September 1, 2022, to September 21, 2022,
the day Plaintiff filed her Complaint [1] and invoked this Court's jurisdiction. According to the
Amended Complaint [14], the TRU Ticket system was first implemented during the COVID-19
pandemic. Am. Compl. [14] at 5; *see also* Mem. [17] at 23 n.5 ("The Tru Tickets and practices
regarding them of which Scherer complains did not exist until the advent of the pandemic in 2020.").
To the extent Plaintiff argues that the Court should consider any possible unclaimed TRU Tickets
occurring after she filed her Complaint [1], it cannot do so as "jurisdictional facts must be judged as
of the time the complaint is filed." *Hartford Ins. Grp. v. Lou-Con Inc.*, 293 F.3d 908, 910 (5th Cir.
2002) (quotation omitted).

which is the amount of unclaimed TRU Tickets from slots gambling at Defendant's casinos. Instead, it discusses the total amount of all unclaimed vouchers at all casinos in Nevada, including "all games that issue wagering vouchers such as some advanced table games and some sports wagering scenarios." Ross, *supra*. Although MGM owns a significant number of casinos on the Las Vegas Strip, *see* Ex. [28-2]; [28-4], the Court would have to speculate as to the percentage of the $22,000,000.00 attributable to TRU Tickets issued from Defendant's kiosks for cashing out of slot machines.[10]

Next, Plaintiff points to MGM's 2021 Annual Report to the Securities and Exchange Commission [24-5], arguing that the Court should consider the overall amount of money gambled on slot machines at Defendant's casinos because "[t]he astronomical numbers involved in slot gaming at MGM casinos justify the $5 million jurisdictional minimum." Mem. [28] at 8; Ex. [24-5] at 50-51. Specifically, the Annual Report [24-5] shows that, in 2021, $15,089,000,000.00 was wagered at Defendant's Las Vegas casinos, and $25,566,000,000.00 was wagered at Defendant's other casinos in the United States, for a total of $40,655,000,000.00 gambled on MGM slot machines.[11] Ex. [24-5] at 50-51. While this is undoubtedly a substantial

---

[10] In addition, individuals interviewed in the article note that some players retain the vouchers "as souvenirs" or choose not to go to the cage "if there's a line," Ross, *supra*, which further demonstrates that not all unclaimed TRU Tickets can properly be included as class members who are harmed by Defendant's alleged failure to provide sufficient notice of how to redeem the TRU Tickets, *see* Am. Compl. [14] at 7-9.

[11] Plaintiff claims that the "Annual Report shows that $16 *billion* was gambled in slots in one year." Mem. [28] at 8 (citing Ex. [24-5] at 50) (emphasis in original). It is unclear to the Court whether Plaintiff was rounding up the $15,089,000,000.00 gambled at the Las Vegas casinos or if Plaintiff was relying on some other number, though it was unable to locate this figure anywhere in the Annual Report.

sum, it includes numerous irrelevant values such as (1) the amount that is lost upon wagers and therefore cannot be cashed out; (2) the amount that was paid out in dollars upon inserting a cash-out voucher into a kiosk; and (3) the amount of TRU Tickets that were ultimately collected. Only the portion of the amount wagered that ultimately became an uncollected TRU Ticket could be in controversy here, and Plaintiff has provided no facts to suggest how much that figure may be.

"When [the amount in controversy is] challenged, it must be adequately founded in fact" either by pleading or affidavit. *Diefenthal*, 681 F.2d at 1052-53. Faced with Defendant's challenge to Plaintiff's allegations and the evidence it offers in support of its contentions, Plaintiff has provided the Court with only vastly overinclusive amounts and requests it to speculate as to what portion of those figures are possibly in controversy here. The Court also notes that to the extent Plaintiff has further qualms with Defendant's data beyond those already discussed, Plaintiff never requested jurisdictional discovery to seek whatever additional records she believes Defendant holds that would show the evidence of another $4,000,000.00 in unredeemed TRU Tickets. In light of the record before the Court, it cannot merely accept Plaintiff's speculative claims of damages and it appears legally certain that the requisite amount in controversy is not satisfied here. *See Diefenthal*, 681 F.2d at 1052-53; *Hartford Ins. Grp.*, 293 F.3d at 912; Ex. [21] at 2-3, 5. Accordingly, the Court finds that it lacks subject-matter jurisdiction over Plaintiff's claim.

### III. CONCLUSION

To the extent the Court has not specifically addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant MGM Resorts International's Motion [16] to Dismiss is **GRANTED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the claims of Plaintiff Leane Scherer, on behalf of herself and all others similarly situated, are **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction. The Court will enter a separate Final Judgment in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED**, this the 4th day of April, 2023.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE